UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL JEROME MORRIS,

        Petitioner,

                                             CASE NO. 15-cv-11672

v.                                      HONORABLE SEAN F. COX

MARY BERGHUIS,

        Respondent.

_____/

**OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION,
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY,
AND GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS***

State prisoner Michael Jerome Morris ("Petitioner") filed a *pro se* petition for the writ of

habeas corpus under 28 U.S.C. § 2254. The petition challenges Petitioner's convictions for

conducting a criminal enterprise, Mich. Comp. Laws § 750.159i(1), conspiracy to commit false

pretenses involving a value of $20,000 or more, Mich. Comp. Laws § 750.157a, and three counts

of false pretenses involving a value of $20,000 or more, Mich. Comp. Laws § 750.218(5)(a).

Petitioner alleges as grounds for relief that (1) the admission of a default judgment entered

against him in a civil case violated his Fifth Amendment right to remain silent, (2) his trial

attorney was ineffective, (3) there was insufficient evidence at trial to support his convictions,

and (4) the prosecutor engaged in misconduct. Respondent Mary Berghuis urges the Court to

deny the petition on grounds that Petitioner procedurally defaulted his fourth claim and that none

of Petitioner's claims have merit. The Court agrees that Petitioner's fourth claim is procedurally

defaulted and that his other claims do not warrant habeas relief. Accordingly, the petition will be

denied.

# I. Background

Petitioner and his co-defendant, William Theartist Perkins ("Perkins"), were tried jointly before a single jury in Wayne County Circuit Court. The evidence at trial established that Petitioner

> engag[ed] in a scheme with codefendant Perkins to supply kiosks to churches in the Detroit area through an entity known as Television Broadcasting Online ("TVBO"), during which church officials were led to believe that the kiosks would be provided at no cost to the churches and that all costs would be assumed by national sponsors. Although defendant and codefendant Perkins were situated in Washington, D.C., they came to the Detroit area to make presentations and to assist in supplying the kiosks to churches. Bishop Henry Washington, who was involved in local business-orientated support for churches through the Office of Ecclesiastical Council, was enlisted to market TVBO's kiosk program in the Detroit area. According to Washington, defendant explained to him that a church could receive a kiosk at no cost to the church because sponsors would pay for the cost of the kiosks. At various presentations explaining the program, church officials were invited to submit applications to participate in the kiosk program. If the church qualified, a kiosk would be delivered to the church.
>
> The prosecution presented evidence that at the time of delivery, various documents were presented to church officials for signature. Among the documents was a four-year lease agreement with a leasing company. The churches were provided with funds to make the initial lease payments based on representations that the funds had been provided by sponsors. The leasing company would purchase the kiosk from TVBO and acquire the lease agreement with the church. Eventually, TVBO stopped providing funds for the lease payments and the leasing company sought collection directly from the churches, leading to a number of lawsuits. One lawsuit was filed by 20 churches against defendant, codefendant Perkins, TVBO, and other entities, and led to the entry of a default judgment against defendant. The judgment awarded money damages to the civil plaintiffs and voided the lease agreements on the basis of fraud.

*People v. Morris*, No. 303102, 2013 WL 6244700, at *1 (Mich. Ct. App. Dec. 3, 2013).

There was additional evidence that Petitioner made a net profit of approximately $20,000 on each kiosk that he sold to the leasing companies. His defense to the charges was that he did not lie to any of the pastors who ordered kiosks, that he did not try to trick the pastors into

2

signing documents, and that he did not try to get money by deceit, fraud, or any kind of false representation. He maintained that he simply was unable to keep his commitment to the churches because he lacked adequate funding for the project.

Although an individual named Larry Richards provided TVBO with $410,000 through an umbrella organization known as Diversity Financial Services Network ("DFN"), Petitioner testified that the money was used for operating expenses and that DFN sent no additional money to cover the churches' payments to the leasing companies. Additionally, an investor named Jesus Linares initially promised to give DFN $3,200,000 for the project, but he later reneged on his promise.

Perkins did not testify or present any evidence, and on October 26, 2010, the jury found both Petitioner and Perkins guilty of conducting a criminal enterprise, conspiracy to commit false pretenses, and three counts of false pretenses. The jury acquitted Petitioner of one additional count of false pretenses and four counts of fraud. On December 22, 2010, the trial court sentenced Petitioner to imprisonment for seventy months to twenty years for the criminal-enterprise conviction and to concurrent terms of five to ten years in prison for the other four convictions. The Michigan Court of Appeals affirmed Petitioner's convictions and sentences, *see id.*, and on May 27, 2014, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Morris*, 495 Mich. 1007; 846 N.W.2d 401 (2014). On May 8, 2015, Petitioner filed his habeas corpus petition.

## II. Standard of Review

Pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the Court may grant an application for the writ of habeas corpus only if the state court's adjudication of the prisoner's claims on the merits

    (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Williams v. Taylor*, 529 U.S. 362, 411 (2000).  "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

## III. Analysis

### A.  The Admission of the Default Judgment in Evidence

Petitioner alleges that the state trial court violated his right to due process by admitting in evidence a default judgment that the churches obtained against him in a civil lawsuit.  (10/7/10 Trial Tr., at 25.)  Petitioner contends that his failure to defend the civil lawsuit was pretrial silence protected by the Fifth Amendment and that the Fifth Amendment was violated because he was forced to testify at his criminal trial to explain why he did not answer the civil complaint. Petitioner also alleges that the default judgment was admitted improperly under the Michigan Rules of Evidence. According to him, there was no evidence that he intended his failure to answer the civil lawsuit to be an admission, and the evidence had no probative value in his criminal case.

The Michigan Court of Appeals rejected Petitioner's claim of constitutional error and concluded that the trial court did not abuse its discretion by refusing to exclude the evidence under the Michigan Rules of Evidence.  The Court of Appeals also concluded that any error in admitting the default judgment was harmless.

### 1.  Clearly Established Federal Law

Petitioner's claim challenges an evidentiary ruling, and to the extent that the admission of evidence about the default judgment may have violated Michigan's rules of evidence, the error is not cognizable on federal habeas review.  *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009). "In conducting habeas review, a federal court is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

Petitioner's constitutional argument is based on the Fifth Amendment, the Supreme Court's decision in *Griffin v. California*, 380 U.S. 609 (1965), and the Sixth Circuit's decision in *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000). The Fifth Amendment provides that, "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In *Griffin*, the Supreme Court held that "the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin*, 380 U.S. at 615. In *Combs*, the Sixth Circuit concluded that "the privilege against self-incrimination applies to a prearrest situation" and "that the use of prearrest silence as substantive evidence of guilt is an impermissible burden upon the exercise of that privilege." *Combs*, 205 F.3d at 285.

## 2. Application

Petitioner does not dispute that the civil case against him occurred before his arrest on criminal charges. But even assuming that the Sixth Circuit's conclusion in *Combs* applies to the facts in this case, *Combs* "employed a pre-AEDPA standard." *Moore v. Mitchell*, 708 F.3d 760, 787 (6th Cir. 2013). Petitioner's case, in contrast, is governed by AEDPA because he filed his petition long after AEDPA was enacted in 1996. *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006). "Under AEDPA, a federal court may grant a writ of habeas corpus with respect to a 'claim that was adjudicated on the merits in State court proceedings' if the state court's decision

was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' 28 U.S.C. § 2254(d)(1)." *Id.*

"[T]he Supreme Court has expressly declined to consider 'whether or under what circumstances prearrest silence may be protected by the Fifth Amendment,' " *Bond v. McQuiggin*, 506 F. App'x 493, 498 (6th Cir. 2012) (quoting *Jenkins v. Anderson*, 447 U.S. 231, 236 n.2 (1980)), and "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1)." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (*per curiam*). Consequently, *Combs* cannot form the basis for habeas relief under AEDPA. *See id.* at 48-49. "The lack of a Supreme Court decision regarding whether the prosecution may introduce evidence of a defendant's prearrest silence during its case in chief precludes federal habeas relief in this matter." *Mitchell v. Lafler*, 118 F. App'x 24, 27 (6th Cir. 2004).

Furthermore, trial counsel informed the jury in his opening statement and closing argument that the default judgment was entered against Petitioner because Petitioner was not in a position to defend himself. (10/12/10 Trial Tr., at 98; 10/21/10 Trial Tr., at 121.) Trial counsel also pointed out that some of the churches had defaulted on lawsuits brought against them. (10/12/10 Trial Tr., at 99.)[1]

Petitioner himself testified that the default judgment was entered because he lacked the necessary resources to defend against the lawsuit. He denied the suggestion that his failure to

---

[1] Pastor Roy Hill, for example, testified that United Leasing obtained a default judgment against his church when he failed to respond to the company's lawsuit. (10/13/10 Trial Tr., at 63.)

defend the civil case was because he agreed with the churches that he had defrauded them and taken their money.  (10/20/10 Trial Tr., at 100, 122, 124.)

Given Petitioner's testimony, trial counsel's arguments, and Petitioner's acquittal of four counts of fraud and one count of false pretenses, the alleged error could not have had a "substantial and injurious effect or influence" on the jury's verdict and, therefore, was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 766 (1946)).  Although Petitioner maintains that the error was not harmless because he was forced to testify to explain the reason why he could not defend against the civil litigation,

> the defendant in a criminal trial is frequently forced to testify himself or herself and call other witnesses in an effort to reduce the risk of conviction. That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination. *Williams v. Florida*, 399 U.S. 78, 83-84 (1970).  The decision whether or not to testify necessarily implies some collateral limitations on one's ability to assert a claim or defense.  Such difficult litigation choices do not, however, substantially infringe Fifth Amendment rights.  *Witter v. I.N.S.*, 113 F. 3d 549, 555 (5th Cir. 1997).  The Fifth Amendment does not insulate a defendant from all difficult choices that are presented during the course of criminal proceedings or even from all choices that burden the exercise or encourage the waiver of the right against self-incrimination.  *United States v. Frazier*, 971 F. 2d 1076, 1080 (4th Cir. 1992).

*Holman v. Burt*, No. 2:17-CV-11647, 2018 WL 627111, at *3 (E.D. Mich. Jan. 29, 2018) (unpublished).

For all the reasons given above, the state appellate court's rejection of Petitioner's claim was objectively reasonable.  Habeas relief is not warranted on Petitioner's claim.

## B.  Trial Counsel

Petitioner alleges next that his trial attorney was constitutionally ineffective for failing to (1) call material witnesses and present documentary evidence, (2) cross-examine or effectively

cross-examine and impeach witnesses, and (3) object to the admission of a document and an incorrect statement made by counsel for co-defendant Perkins during closing arguments. The Michigan Court of Appeals adjudicated these claims on the merits and rejected them.

### 1. Clearly Established Federal Law

The "clearly established Federal law" for Petitioner's claim of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). *Cullen v. Pinholster*, 563 U.S. 170, 189 2011). Under *Strickland*, a defendant must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

The deficient-performance prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688.

The "prejudice" prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were

reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### 2. Failure to Call Material Witnesses

Petitioner contends that his trial attorney should have called several witnesses and produced numerous documents that would have debunked the prosecution's theory and supported his defense that he was conducting a legitimate business and did not intend to defraud the churches. Under *Strickland*, however, the Court "must presume that decisions of what evidence to present and whether to call or question witnesses are matters of trial strategy." *Cathron v. Jones*, 77 F. App'x 835, 841 (6th Cir. 2003) (citing *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002)). For the following additional reasons, the Court concludes that defense counsel was not ineffective for failing to produce the witnesses and documents in question.

### a. Larry Richards and Jesus Linares

As noted above, Larry Richards, through DFN, provided financial support for TVBO. Petitioner claims that trial counsel should have called Richards as a witness to bolster Petitioner's credibility by providing first-hand knowledge about the legitimacy of the kiosk project and by explaining that DFN was the national sponsor for the kiosks.

Although the prosecutor included both Richards and Linares on his witness list, he moved to strike them from the list during trial, and defense counsel did not object to the prosecutor's motion. (10/18/10 Trial Tr., at 97-99.) The lack of an objection to the prosecutor's motion is an indication that the decision not to call Richards and Linares as defense witnesses was a strategic one.

It was reasonable strategy not to call Richards as a defense witness because Richards stated in an e-mail to an appellate attorney after Petitioner's trial that, although Petitioner and TVBO were important parts of DFN's business model as marketing agents, the kiosks were never a part of the business model, and he had no interest in them. Pet. for Writ of Habeas Corpus, Ex 7, p. 2. He also stated in his e-mail to the appellate attorney that he ended the arrangement with Petitioner in late 2007, because he had been unable to successfully raise funds for DFN. These comments tended to support the prosecution's theory that the kiosks were not a part of DFN and that Petitioner engaged in false pretenses by continuing to tell church officials that there was a sponsor for the kiosks even though there were no funds for the project. Thus, there was a risk that Richards would not have helped Petitioner's case if he had testified.

Petitioner alleges that trial counsel also should have called Jesus Linares as a witness, because Linares could have testified that he initially agreed to support DFN, but subsequently reneged on his promise. That evidence was established by other witnesses. Furthermore, Linares could have hurt Petitioner's defense, because he allegedly told Petitioner in late 2007 or early 2008 that he was unwilling to invest even $150,000 in the kiosk venture because he lacked confidence in the product and thought that Petitioner seemed desperate. He also opined that the kiosk venture was separate from DFN. *See* Pet. for Writ of Habeas Corpus, Ex. 2.

To his credit, trial counsel produced Reverend Walter E. Fauntroy to support Petitioner's defense, and Reverend Fauntroy explained that the kiosks were the vehicle through which the services and functions of DFN were brought to people in the churches. (10/18/10 Trial Tr., at 29-30.) He described DFN and the kiosks as "linked," *id*. at 68, and part of the same package (*id*. at 69), and he stated that, although Mr. Linares was supposed to fund DFN, Linares did not

follow through with his commitment. *Id.* at 69-71.[2]  Reverend Fauntroy also testified that none

of the people with whom he spoke considered themselves cheated by Petitioner, *id.* at 37, and

even though his own church had problems with their kiosk, he did not lose faith in Petitioner.  He

continued to believe in Petitioner's integrity and what Petitioner was trying to do.  *Id.* at 77, 81.

Given Reverend Fauntroy's testimony and the risks involved in calling Richards and Linares as

witnesses, Petitioner was not prejudiced by trial counsel's failure to produce either Richards or

Linares.

### b.  Michael Laskosky and Cherie Jarchow

Michael Laskosky and Cherie Jarchow were employees of the leasing company.

Petitioner asserts that their testimony would have confirmed that (i) TVBO made payments to the

leasing company on the churches' behalf, (ii) the churches likely knew they were signing a lease

and that they responsible for the payments, and (iii) he had a valid agreement with the leasing

company.  The prosecution moved to strike Laskosky and Jarchow, and the defense attorneys did

not object.  (10/18/10 Trial Tr. at 98-99).  Once again, the lack of an objection tends to show that

trial counsel's failure to call Laskosky and Jarchow as defense witnesses was a strategic

decision.

It is also possible that Laskosky and Jarchow would not have provided favorable

testimony for Petitioner because employees of the leasing company apparently informed church

officials that Petitioner was not being honest with them.  *See* Pet. for Writ of Habeas Corpus,

Ex. 5B, p.1.  Laskosky and Jarchow might have been hostile defense witnesses for an additional

---

[2]  Bishop Henry Washington and Petitioner also testified that Mr. Linares reneged on his commitment to DFN.  10/19/10 Trial Tr., at 46 (Bishop Washington's testimony); 10/20/10 Trial Tr. at 47 (Petitioner's testimony).

reason: Petitioner sued the leasing company after the company began to withdraw money from the churches' bank accounts. (10/20/10 Trial Tr., at 96-99.) Trial counsel was not ineffective for failing to call Laskosky and Jarchow.

### c. Brett Murray, Delinia Weaver, Harold Bryant, Orlando McDowell, Jess Judson, and Tracey Lester

Petitioner alleges that Brett Murray, Delinia Weaver, Harold Bryant, Orlando McDowell, Jess Judson, and Tracey Lester were representatives of TVBO and that trial counsel could have called them to disprove the prosecutor's allegations that there was no relationship between DFN and the kiosk program. Exhibits to the habeas petition include affidavits from Murray, Weaver, Bryant, McDowell, Judson, and Lester. The affidavits state that in January of 2009, Larry Richards conducted a meeting for the purpose of addressing the relationship between TVBO and DFN. *See* Pet. for Writ of Habeas Corpus, Ex. 6-6E. But the affidavits do not describe, or provide any details about, the relationship between DFN and the kiosk program. Thus, Murray, Weaver, Bryant, McDowell, Judson, and Lester in all likelihood would not have provided a substantial defense for Petitioner.

To summarize, it is far from certain that the witnesses whom Petitioner claims defense counsel should have called would have been favorable to the defense. Trial counsel was not ineffective for failing to call the witnesses because he had no professional obligation to call witnesses whose testimony would not have exculpated Petitioner. *Millender v. Adams*, 376 F.3d. 520, 527 (6th Cir. 2004).

### 3. Failure to Investigate and Produce Documents

Petitioner claims that his attorney should have investigated and produced documents which would have shown that his business dealings were honorable and that he did not intend to

defraud the churches. Trial counsel did admit some documents in evidence, and even assuming that additional documents would have been admissible under the Michigan Rules of Evidence, Petitioner's attorney acted reasonably in eliciting important information from Petitioner and Reverend Fauntroy.

Trial counsel also made an effective closing argument and convinced the jury to acquit Petitioner of five of the ten charges against him. As for the remaining charges, there was overwhelming evidence that Petitioner and Perkins provided the churches with malfunctioning kiosks and falsely informed church officials that they would incur no costs if they accepted the kiosks. There is not a reasonable probability that the result of the trial would have been different if trial counsel had investigated and introduced additional documents in evidence.

### 4. Failure to Cross-Examine and Impeach Witnesses

### a. Isaac King and Henry Washington

Bishop Isaac King, Jr., testified on re-direct examination by the prosecutor that Bishop Henry Washington did not mention DFN to him. (10/14/10 Trial Tr., at 157.) Petitioner contends that his attorney had documentation showing that Washington did mention DFN to King. Therefore, according to Petitioner, either Washington or King was lying about DFN and its relationship to the kiosks, and trial counsel was ineffective for failing to impeach the men with discrepancies in their testimony.

Bishop Washington's trial testimony actually was consistent with Bishop King's testimony that Washington did not mention DFN to him. Bishop Washington testified that he mentioned DFN to only one pastor and that was Bishop James Williams. (10/18/10 Trial Tr. at 182.) Thus, it appears that neither Washington, nor King, was lying. Although exhibits to the

14

habeas petition indicate that Washington did speak with Bishop King about DFN, *see* Pet. for Writ of Habeas Corpus, Exs. 16 and 16A, it is not clear whether Washington actually used the words "Diversity Financial Network" or the initials "DFN" when speaking with Bishop King. He may have merely described the kiosk program without naming the entity allegedly supporting the program.

Even if the Court were to assume that Bishop Washington did mention DFN by its full name or initials to Bishop King, it does not necessarily follow that King was lying or deceitful when he said that Washington did not mention DFN to him. He could have forgotten the details of their conversation or simply misunderstood what Bishop Washington said to him. This was a minor issue in any event. Therefore, Petitioner was not prejudiced by the failure to cross-examine Bishops Washington and King about whether Washington told King about DFN.

### b.  Failure to Cross-Examine Willie Powell, Richard Robinson, and Roy Hill

Next, Petitioner claims that trial counsel should have asked Willie Powell, Richard Robinson, and Roy Hill about payments that TVBO was making directly to the leasing company. However, it is not clear from the record whether TVBO actually paid the leasing company in the churches' behalf. Petitioner, in fact, testified that he was told the leasing company did not want to accept payments directly from vendors. (10/20/10 Trial Tr., at 84.) For this reason, trial counsel was not ineffective for failing to cross-examine Powell, Robinson, and Hill on the issue.

### c.  Failure to Effectively Cross-Examine Roy Hill

Petitioner asserts that trial counsel should have impeached Roy Hill when Hill testified that he was not aware that he was signing a lease and that he had never heard of United Leasing. (10/13/10 Trial Tr., at 70, 72). Petitioner claims that trial counsel had documentation showing

that Hill was aware of the fact that he had to apply for a lease from United Leasing in order to participate in the kiosk program.

The record indicates that trial counsel did question Hill at length about the lease, the related documents, and the discrepancy between his testimony and the fact that his signature was on the documents. *Id.* at 33-48. Hill even admitted on cross-examination by trial counsel that he signed a document stating, "We have entered into an Equipment Lease Agreement with United Leasing Associates for the following equipment with a value of 27,500 dollars. Type of Equipment: Audiovisual equipment." *Id.* at 47. Hill, nevertheless, maintained that he did not read the documents, that someone had told him the papers were just a formality, and that the documents were not legible. *Id.* at 48. Trial counsel was not ineffective for failing to do more to impeach Hill when Hill continued to maintain that he did not know he was signing a lease or a contract.

The Court concludes that trial counsel's cross-examination of witnesses did not amount to deficient performance. In the alternative, the deficient performance did not prejudice the defense.

### 5. Failure to Object

Petitioner's final complaint about trial counsel is that counsel failed to object to the admission of a document and an incorrect statement of the law.

### a. Exhibit 8

First, Petitioner contends that trial counsel should have objected to the introduction of an unsigned and unauthenticated document (Exhibit 8). The Michigan Court of Appeals explained the background for Petitioner's claim as follows:

16

The prosecutor initially introduced this document, without objection, during the testimony of Bishop Meredith Bussell, who identified the exhibit as the same type of document that was provided to him during the course of the kiosk program, with the exception of the date. A later prosecution witness, Edward Anderson, who identified himself as a regional sales representative for TVBO's kiosk program in the Detroit area, similarly identified the document as one provided to churches to explain the kiosk program.

*Morris*, 2013 WL 6244700, at *6; *see also* 10/14/10 Trial Tr., at 13-15 (Bishop Bussell's testimony); 10/14/10 Trial Tr., at 34-35 (Edward Anderson's testimony).

The exhibit stated that the anchor sponsor would pay the entire forty-eight months of the lease for the kiosk. (10/20/10 Trial Tr., at 49; 10/21/10 Trial Tr., at 103.) Petitioner denied having previously seen the document or generating it even though it was prepared on his letterhead and had his logo on it. He also stated that he did not review any documents that were generated, produced, and distributed to the pastors in Detroit, and that he did not provide that particular document to Bishop Washington or Washington's assistants. (10/20/10 Trial Tr., at 57-60, 79.)

Petitioner alleges in his habeas petition that the prosecution offered the exhibit as proof that he misrepresented the terms of the kiosk program to the churches. He maintains there is no evidence that he ever distributed the document to church officials or that he authorized the presentation or distribution of the document.

The Michigan Court of Appeals determined that the exhibit was admissible under the Michigan Rules of Evidence because it was relevant to the charges and because there was sufficient testimony that it was what it was purported to be, namely, a document that outlined the kiosk program and was provided to churches participating in the program. The state court's interpretation of state law binds this Court on habeas corpus review, *Bradshaw v. Richey*, 546

U.S. 74, 76 (2005), and because the state court concluded that there was no meritorious basis for excluding the evidence, Petitioner's attorney was not ineffective for failing to object to the exhibit. An objection would have lacked merit, and Petitioner's counsel was under no professional obligation to make a meritless objection. *Conley v. Warden Chillicothe Corr. Inst.*, 505 F. App'x 501, 508 (6th Cir. 2012).

### b. Defense Counsel's Comment

Petitioner also argues that defense counsel was ineffective for failing to object to a comment made by the co-defendant's attorney during closing arguments. The defense attorney stated, "[I]f there's no intent to defraud, you must find them guilty of all of the charges in the Information." (10/21/10 Trial Tr., at 73). This was an obvious slip of the tongue and, as the Michigan Court of Appeals pointed out, when the attorney's argument is viewed as a whole, "it is apparent that the jury would have understood that counsel inadvertently made a misstatement to the extent he suggested that an intent to defraud was not required for a conviction." *Morris*, 2013 WL 6244700, at *7. In fact, the same attorney correctly stated earlier in his argument that, "[i]f there was no intent to defraud at the time these acts were done and statements made, there is no crime." *Id*. at 56.

The trial court subsequently charged the jurors to apply its instructions as the law. (10/22/10 Trial Tr., at 3.) The trial court then correctly charged the jurors that, to prove fraud, the prosecution had the burden of proving beyond a reasonable doubt that the defendants intended to cheat or defraud the person whose signature was obtained. The court also stated that, to prove false pretenses, the prosecution had to prove that the defendants intended to defraud or cheat someone. *Id*. at 14-15. Because Petitioner's attorney could have anticipated that the trial

18

court's instructions would cure co-counsel's incorrect statement of the law, his failure to object to the comment did not constitute deficient performance. Additionally, the allegedly deficient performance did not prejudice Petitioner's defense.

To conclude, trial counsel satisfied *Strickland's* deferential standard, and the state court's rejection of Petitioner's claims about defense counsel was not contrary to, or an unreasonable application of, *Strickland*. Habeas relief, therefore, is not warranted on Petitioner's claim about his trial attorney.

### C. Sufficiency of the Evidence

Petitioner's third claim challenges the sufficiency of the evidence at his trial. Specifically, Petitioner contends that the prosecution failed to prove that he knew the pretense was false when he made representations to the churches and that he intended to defraud or cheat someone. Petitioner maintains that his representations to people that there was a sponsor for the kiosk program were made in good faith and that he relied on reassurances from people who failed to fulfill their commitment to support the program. The Michigan Court of Appeals concluded on review of Petitioner's claim that, "[v]iewed in a light most favorable to the prosecution, the evidence was sufficient to enable the jury to infer that defendant intended to defraud the churches through at least false representations that national sponsors would make all lease payments." *Morris*, 2013 WL 6244700, at *8.

### 1. Legal Framework

The Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Following *Winship*,

the critical inquiry on review of a challenge to the sufficiency of the evidence supporting a

criminal conviction is

> whether the record evidence could reasonably support a finding of guilt
> beyond a reasonable doubt.  But this inquiry does not require a court to
> "ask itself whether *it* believes that the evidence at the trial established guilt
> beyond a reasonable doubt."  Instead, the relevant question is whether,
> after viewing the evidence in the light most favorable to the prosecution,
> *any* rational trier of fact could have found the essential elements of the
> crime beyond a reasonable doubt.  This familiar standard gives full play to
> the responsibility of the trier of fact fairly to resolve conflicts in the
> testimony, to weigh the evidence, and to draw reasonable inferences from
> basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citations and footnote omitted)

(emphases in original).

The Supreme Court has "made clear that *Jackson* claims face a high bar in federal habeas

proceedings because they are subject to two layers of judicial deference."  *Coleman v. Johnson*,

566 U.S. 650, 651 (2012) (*per curiam*).  First, it is the responsibility of the jury to decide what

conclusions should be drawn from the evidence admitted at trial.  *Id.* (quoting *Cavazos v. Smith*,

565 U.S. 1, 2 (2011) (*per curiam*)).  "And second, on habeas review, 'a federal court may not

overturn a state court decision rejecting a sufficiency of the evidence challenge simply because

the federal court disagrees with the state court.  The federal court instead may do so only if the

state court decision was 'objectively unreasonable.' "  *Id.* (quoting *Cavazos*, 565 U.S. at 2); *see*

*also Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017) (explaining that "two layers of

deference apply [to a sufficiency-of-the-evidence claim], one to the jury verdict, and one to the

state appellate court"), *cert. denied*, No. 17-729, __ S. Ct. __, 2018 WL 1369141 (U.S. 2018).

The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *Jackson*, 443 U.S. at 324 n. 16, and in Michigan, the elements of larceny by false pretenses over $20,000 are:

> (1) the defendant must have used a pretense or made a false statement relating to either past or then existing facts and circumstances, (2) at the time the pretense was used the defendant must have known it to be false, (3) at the time the pretense was used the defendant must have intended to defraud someone, (4) the accuser must have relied on the false pretense made by the defendant, (5) because of this reliance that person must have suffered the loss of some money or other valuable thing, and (6) the property obtained by the defendant must have had a fair market value of over [$20,000] at the time of the crime.

*People v. Lueth*, 253 Mich. App. 670, 680–81; 660 N.W.2d 322, 331 (2002). At issue here are the second and third elements of false pretenses: "knowledge by the defendant of the falsity of the representation and use of the misrepresentation with intent to defraud." *People v. Reigle*, 223 Mich. App. 34, 39; 566 N.W.2d 21, 25 (1997).

Conducting a criminal enterprise through a pattern of racketeering, as charged in this case, also contains the elements of fraud and false pretenses. As explained by the state trial court at Petitioner's trial, the prosecution had to establish beyond a reasonable doubt that:

> [t]he Defendant knowingly conducted or participated in the affairs of the enterprise through a pattern of racketeering activity. The term racketeering means committing, attempting to commit, conspiring to commit, or aiding or abetting, soliciting, coercing, or intimidating a person for financial gain involving either of the two following predicate felonies:
>
> One, fraud, obtaining signature to financial document or, two, false pretenses, 20,000 dollars or more.

(10/22/10 Trial Tr., at 14.)

Intent is a question for the jury as factfinder, *Lueth*, 253 Mich. App. at 682-83; 660 N.W.2d at 332, and "can be inferred from the entire evidence." *Reigle*, 223 Mich. App. at 39;

566 N.W.2d at 25.  Petitioner was charged as a principal and as an aider and abettor.  " 'Aiding and abetting' describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime." *People v. Carines*, 460 Mich. 750, 757; 597 N.W.2d 130, 135 (1999) (quoting *People v. Turner*, 213 Mich. App. 558, 568; 540 N.W.2d 728, 733 (1995)).

### 2. Application

Petitioner's three convictions for false pretenses involved Greater Mount Zion Baptist Church in Detroit, Michigan, New Resurrection Faith Ministry in Southfield, Michigan, and Jesus Tabernacle Ministries in Detroit.  Reverend Roy Hill was the senior pastor at Greater Mount Zion Baptist Church.  He testified that two or three years before trial, he attended a meeting at which Petitioner made a power-point presentation about the kiosk program. Petitioner had said that there would be no cost or out-of-pocket expenses for the church because national sponsors would pay whatever costs the church incurred.  (10/12/10 Trial Tr., at 112-16, 130.)  Hill went on to say that there never were any national sponsors, despite what Petitioner and Perkins had said.  *Id*. at 134-36.  Hill also testified that the kiosk did not work properly, that it had no Internet capability, and that it never provided the type of service he was promised. (10/13/10 Trial Tr., at 24-26.)

Bishop Merdith R. Bussell was the pastor at New Resurrection Faith Ministry in Southfield. He attended a meeting where Perkins gave a presentation about kiosks that would provide revenue for the church at no cost to the church because there were national sponsors lined up.  Initially, he received checks from TVBO to pay United Leasing Company, but the checks subsequently stopped coming to the church, and the kiosk never worked, even after a

technician attempted to service it. He called Perkins and Bishop Henry Washington, and both of them told him not to worry about it, but he did not think that Perkins was trying to make good on his promise. In addition, United Leasing brought a lawsuit against his church and took several hundred dollars out of the church's account without his authorization. (10/13/10 Trial Tr., at 170-196; 10/14/10 Trial Tr., at 5-6, 15.)

Bishop David A. Billy, Sr., was the senior pastor at Jesus Tabernacle Ministries on the east side of Detroit. He had no direct dealings with Petitioner or Perkins; instead, Bishop Washington explained the kiosk program to him. Washington had said that businesses in the community would be able to advertise on the kiosk and that there would be no cost to the church because national sponsors would send him checks, which he could deposit and then use to pay the leasing company. His church decided to participate in the program on the basis of representations that there would be no cost to the church, that the church would be able to generate funds from the kiosk, and that it would foster better relations with the community. The kiosk was delivered to the church in late 2007 or early 2008, but it never worked properly. He received two checks from TVBO, which he thought was the national sponsor, but then the checks stopped coming. Church officials made two additional payments out of the church's own accounts because they understood there would be no cost to them. When they stopped paying the leasing company with their own funds, the company sued them and tried to take money out of the church's checking account. They had been promised a sponsor check every month to pay for the leasing agreement, and they were told that Urban Interfaith Network [Petitioner's organization] had located a national sponsor before the machine was placed in the church. (10/14/10 Trial Tr., at 63-74, 81, 83.)

23

Demetra Billy testified that she was an evangelist and board member at Jesus Tabernacle Church. She explained that she signed for the kiosk when Perkins delivered it to the church on December 6, 2007, because Bishop Billy had already talked with Bishop Washington and Perkins about the kiosk and they were out of town at the time. Although the paper she signed was a lease, she was told that she was merely acknowledging receipt of the equipment. *Id*. at 84-88.

Church officials from several other churches testified similarly to the Billys, Bishop Merdith Bussell, and Pastor Roy Hill. There was additional evidence that Petitioner knew at some point in 2007 that Mr. Linares had backed out of his commitment to promote the kiosk program (10/20/10 Trial Tr., at 47-48), and even though he received $410,000 from Larry Richards through DFN, he admitted at trial that he spent $260,000 of the money before he came to Detroit and that he had only $10,000 in his bank account on March 1, 2007. (10/20/10 Trial Tr., at 186-87.) Despite his limited funds, he continued to place kiosks in churches during the summer of 2008. *See* 10/14/10 Trial Tr., at 106 (Bishop James Whitehead's testimony that he acknowledged delivery of a kiosk on June 12, 2008); 10/18/10 Trial Tr., at 106 (Pastor Cleodis Wells' testimony that his church's kiosk was delivered in August of 2008).

Although Petitioner testified that he did not intend to defraud the churches or cheat anyone (10/20/10 Trial Tr., at 125), an assessment of his credibility and that of the other witnesses is "beyond the scope of federal habeas review of sufficiency of evidence claims." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). When reviewing a sufficiency-of-the-evidence claim, the Court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Tanner*, 867 F.3d at 672.

24

Here, a rational trier of fact could have concluded from the evidence taken in the light most favorable to the prosecution that Petitioner conducted a criminal enterprise, that he conspired with Perkins to commit false pretenses, and that he engaged in three acts of false pretenses by falsely promising church officials that national sponsors would cover the cost of the kiosks. Therefore, the decision of the Michigan Court of Appeals was not contrary to, or an unreasonable application of, *Jackson,* and Petitioner has no right to relief on the basis of his challenge to the sufficiency of the evidence. The existence of sufficient evidence to convict defeats his claim. *Matthews*, 319 F.3d at 788-89.

### D. The Prosecutor

Petitioner's fourth and final claim alleges that the prosecutor deprived him of a fair trial by (1) arguing inaccurate facts, (2) mischaracterizing a valid contract as a phony agreement, and (3) arguing false and misleading statements during closing arguments. Respondent argues that Petitioner procedurally defaulted his prosecutorial-misconduct claim by failing to make a contemporaneous objection to the prosecutor's conduct. The Court agrees.

### 1. Procedural Default

A procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997). Under the doctrine of procedural default, "a federal court will not review the merits of [a state prisoner's] claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). In this Circuit,

> "[a] habeas petitioner's claim will be deemed procedurally defaulted if each of the following four factors is met: (1) the petitioner failed to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal

constitutional claim; and (4) the petitioner has not shown cause and prejudice excusing the default." [*Jalowiec v. Bradshaw*, 657 F.3d 293, 302 (6th Cir. 2011)]. To determine whether a state procedural rule was applied to bar a habeas claim, [courts] look "to the last reasoned state court decision disposing of the claim." *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc).

*Henderson v. Palmer*, 730 F.3d 554, 560 (6th Cir. 2013).

## 2. Application

The state procedural rule in question here is Michigan's contemporaneous-objection rule. This rule requires defendants in criminal cases to preserve their appellate claims by specifically objecting on the same ground in the trial court. *See People v. Buie*, 298 Mich. App. 50, 70-71; 825 N.W.2d 361, 374 (2012).

In his reply to Respondent's answer to the petition, Petitioner acknowledges that his trial attorney failed to object to the prosecutor's alleged misconduct during trial. *See* Reply to Respondent's Opp'n to Petitioner's Writ of Habeas Corpus, p. 16. Thus, the first procedural-default factor (failure to comply with a state procedural rule) is satisfied.

The second procedural-default factor is enforcement of the state procedural rule. The Michigan Court of Appeals was the last state court to adjudicate Petitioner's claim in a reasoned opinion. It enforced the contemporaneous-objection rule by reviewing Petitioner's claim for "plain error affecting [Petitioner's] substantial rights," because Petitioner did not preserve the issue for appellate review by either objecting to the prosecutor's remarks or raising the issue in the trial court. *Morris*, 2013 WL 6244700, at *8. The Court of Appeals then briefly analyzed the merits of Petitioner's claim and concluded that he had not demonstrated a plain error.

Petitioner argues that "plain error" review is a review on the merits, but the Sixth Circuit Court of Appeals has said that a state appellate court's review of a claim for "plain error"

26

constitutes enforcement of a state procedural rule. *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) (citing *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (citing *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989)). Furthermore, the state court's alternative holding that the prosecutor's remarks were proper or cured by the trial court's jury instructions "does not require [this Court] to disregard the state court's finding of procedural bar." *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998). As explained in *Harris v. Reed*, 489 U.S. 255 (1989),

> a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. See *Fox Film Corp. v. Muller*, 296 U.S. 207, 210, 56 S.Ct. 183, 184, 80 L. Ed. 158 (1935). Thus, by applying this doctrine to habeas cases, [*Wainwright v. Sykes*, 433 U.S. 72, 97 S. Ct. 2497 (1977)] curtails reconsideration of the federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision. In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.

*Id*. at 264 n.10 (emphasis in original). The second factor is satisfied.

The third procedural-default factor is satisfied if the state procedural rule in question is an adequate and independent state ground for denying review of a federal constitutional claim. "The adequacy of a state procedural bar turns on whether it is firmly established and regularly followed; a state rule is independent if the state court actually relies on it to preclude a merits review." *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005) (citing *Abela v. Martin*, 380 F.3d 915, 921 (6th Cir. 2004)). "Michigan's contemporaneous-objection rule is both a well-established and normally enforced procedural rule," *Taylor v. McKee*, 649 F.3d 446, 451 (6th Cir. 2011), and the Michigan Court of Appeals relied on the rule to preclude full review of Petitioner's prosecutorial-misconduct claim. The third procedural-default factor is satisfied.

27

The fourth factor requires Petitioner to show "cause" for his failure to make a proper objection at trial and resulting prejudice. Petitioner has not advanced any argument in support of a finding of "cause and prejudice." The Court, therefore, deems the "cause and prejudice" argument abandoned. *Roberts v. Carter*, 337 F.3d 609, 613 (6th Cir. 2003) (citing *United States v. Cofield*, 233 F.3d 405, 407 (6th Cir. 2000)). All four factors constituting a procedural default have been satisfied.

In the absence of "cause and prejudice," a habeas petitioner may pursue a procedurally defaulted claim only if he can demonstrate that failure to consider his claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

> "A 'miscarriage of justice' exists only if the record is 'devoid of evidence pointing to guilt.' " *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998) (quoting *United States v. Cannon*, 981 F.2d 785, 790 (5th Cir. 1993)). The exception therefore applies only where there is a colorable claim of factual innocence. *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986).

*Sheffield v. Burt*, No. 16-2468, __ F. App'x, __, 2018 WL 1887618, at *4 (6th Cir. Apr. 20, 2018). The record before the Court is not devoid of evidence pointing to guilt. Therefore, a miscarriage of justice will not occur as a result of the Court's failure to address the substantive merits of Petitioner's prosecutorial-misconduct claim.

## IV. Conclusion

For the reasons given above, Petitioner's fourth claim is procedurally defaulted, and the state appellate court's adjudication of Petitioner's first three claims on the merits was not contrary to Supreme Court precedent or an unreasonable application of Supreme Court precedent. The state court also did not unreasonably apply the facts to Petitioner's case, and its dispositive opinion was not so lacking in justification that there was an error beyond any

possibility for fairminded disagreement. Accordingly, the Court denies the petition for writ of habeas corpus with prejudice.

Petitioner may not appeal the Court's denial of his habeas petition unless a district or circuit judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Reasonable jurists would not disagree with the Court's assessment of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further. Accordingly, the Court denies a certificate of appealability. The Court, nevertheless, will allow Petitioner to proceed *in forma pauperis* on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

Dated: May 22, 2018                                  s/ Sean F. Cox
                                                     Sean F. Cox
                                                     United States District Judge

I hereby certify that on May 22, 2018, the document above was served on counsel of record via electronic means and upon Michael Jerome Morris via First Class Mail at the address below:

MICHAEL MORRIS 786171
G. ROBERT COTTON CORRECTIONAL FACILITY
3500 N. ELM ROAD
JACKSON, MI 49201

                                                     s/J. McCoy
                                                     Case Manager